May it please the court, I'm Daniel Kapelovitz for the appellant, Mr. John C. Sears. Mr. Sears, like he does every day, was walking with his mules. He walked about 15 to 20 miles and the evening he needs to find a place to sleep and that's what he did. He had no idea he had entered federal land. He had walked through a breach in the fence but it was a path, a well-worn path. He had no idea that he was in an area not designated for camping. In fact, the default rule is that people can camp unless there's notice otherwise. When you say default rule, whose default rule is this and what places are you referring to? The National Parkland and the rules that the parks are open 24 hours a day unless there's these compendiums which are issued and then there's supplements to the compendiums and then there's sometimes those just say whatever's posted. So it's very difficult for a person to know even what the law is. No, I got that part. If you're wandering around and the fence is down or there's a hole in the fence and it's not posted right where you are, you may or may not know that that's under the jurisdiction of the National Park. I got that. Okay. Right. And there's no way, you can't sound like there's a set of statutes or you look up and see. You have to know how to navigate through the compendiums, the supplements, the signs and he never saw a sign saying that he cannot sleep in the National Park and he didn't even know he was in the National Park. Okay, counsel, Judge Gould, if I could ask you a question. Assuming that's correct, but once the guards or the rangers tell him where he is and tell him that he needs to move, you know, why doesn't that contention fall away? Well, you're right. At that point, he did have notice, but at that point, every time after that point, he never again camped. He was arrested. He didn't have a chance to camp at that point. So the camping conviction should go away. Was there a dispute in the law court over his refusal, alleged refusal, to move to some, I think, farm or ranch house that the rangers supposedly got for him? Yeah, there was, well, that was the only really factual issue disputed in the trial court is whether he was told that he could go to this ranch, this equestrian ranch. He said he was never told he could go there and in his prior experience, he testified that he's known that he can't just show up to a ranch like that in the middle of the night and be accepted. So he had no idea he could go to that ranch. And even if he could go to the ranch, the only way to get there was either go a few miles through the wilderness, the bony hills or whatever, which had been dangerous for him and the mules, or to go back the path and go around the streets, which would also be dangerous because there are cars that go by. I thought there was testimony in the record that this ranch, if that's the right word for it, was down the administrative road by several miles rather than either through the woods or out on the public streets. I think the rangers claimed it was like two miles and I'm not sure if that's through the administrative road. I know since then I've Googled it. I know it's not part of the record. As a crow flies, it's actually longer and then it must be even longer along the roads. When you say the road, are we talking about the administrative road or are we talking about city streets? I think the administrative road goes down to the city streets and then the streets would go down to the ranch. Okay, but you're also telling us that what you just told us may or may not be in the record. What we have is the testimony from both sides. Right, but it was, I guess they're saying, well he wasn't on the administrative road, he was on a path. So it would have taken somehow get on the administrative road and then take that. The administrative road's for the federal park so it wouldn't be part of this state park, the ranch. And not only would it have been dangerous to go on the streets if he went that way, it'd be illegal because he has to follow vehicle codes and believe it or not with horses and have to have them well lit up and so either way it'd be dangerous and that way it'd be illegal and his choices were to either go back to sleep or risk injury and possibly breaking another law. So just based on that, his necessity of defense he should have been. How are we supposed to interpret the statute? We have this rule that I'm not sure I totally approve of it, all the circumstances in which it's applied for certain public welfare statutes, mens rea, intention, knowledge, those things, they're not required. Why is this not a public welfare statute? Well public welfare statutes, one thing, they usually have small punishment. I know people think six months in jail is a minor punishment but even the Supreme Court has said in Baldwin v. New York, the prospect of imprisonment for however short time will trivial or petty matter and may well result in quite serious repercussions affecting his career and reputation and that's one of the other question is whether something would affect their reputation and public welfare offenses usually don't whereas... Well no but when I'm talking about public welfare statutes, I'm talking about certain statutes that are designed to protect for example the parks by no open fires and so on. There are some of these statutes because the harm is well understood and because it's difficult to prove certain mens rea, we understand the statute to say if you do it, that's a violation, period. So I'm not really talking about the length of the punishment, I'm talking about the type of the act. Right, well perhaps if the law was lighting fires here, that'd be one thing, but here he was just had an open fire though to cook his meal. I believe he had like a cooking unit. Yeah, I shouldn't say open fire as if it were a bonfire, but he did cook in the... Do we need to reach the mens rea argument if the factual record supports the fact that he's not only on notice by rangers at some point that he's in a prohibited area against camping and supports that he refused saying that he was going to sleep there anyway overnight despite that notice? Well again at that point he did have notice, and but in terms of the, so the camping yes at that point he has on notice. And then his refusal? And so then his refusal, that's the other charge, refusing a lawful order, and my argument would be that it wasn't lawful because they're ordering him to risk his life. But at that point yes he was on notice. But the mens rea, what I'm saying is he should have had to know, there had to be knowledge that he was on federal land and in an area where he wasn't allowed to camp. So when you say the risk is life, once he's told by the rangers that he's camping where he should not be, and so he now is on notice, and he says now you can go down the way here, whether it's through the woods or across the streets I'm not now specifying, to the horse ranch, you're saying that that was so dangerous that he's got a defense of necessity? I mean let's talk in legal terms instead of risk his life. What's the defense then? The defense for necessity is that there was, he was faced with a choice of evils, and that he acted to prevent imminent harm. The two evils were remain sleeping, which isn't much of an evil, or risk going through the dark after walking 15 to 20 miles with tired mules, and if you had a flashlight that's not enough to light a way to go through either the wilderness or enough to light your way on a street. And that he reasonably anticipated a causal relation to his conduct, which was just to remain, go back to sleep, and the harm be avoided, risking injury, and that he didn't have a legal alternative, and even if he didn't know he could go to this ranch, that's his testimony, they said they told him, but either way he still would have to get there and risk harm. He told the officer that it's not safe for me to leave, that's why he refused to leave. Okay. And then in terms of the right to jury, again to the length of this punishment, again he should, you know, six months is serious, six months incarceration is a serious penalty. I know the Supreme Court has held that that by itself is not enough to entitle someone to a jury, but here we have that, plus $5,000 fine, plus five years, and in federal court they only have formal probation, so he'd have a, he could have a probation officer who goes to his house, you know, I had a dog leash case where he had to have a probation officer just to see if he has dog leashes or not, and it's just... Yeah, I'm afraid the law is pretty clearly against you on that one. Well... Maybe it shouldn't be, but I think it is. Yeah, I mean the Constitution can be clear, it's the only right that's in the Constitution twice, in the Sixth Amendment and in the Article Three, so I'm not, and in terms of administrative justice, it would not be that difficult. These, you know, they do it in California court all the time, and if there are no further questions... Yeah, why don't you, you've got five minutes, that will be on reserve so you can respond to whatever the government might want to say. All right, thank you. Good morning, your honors, and may it please the court, Mark Yohalam on behalf of the United States. I want to start by clarifying a few points about the record from my opponent's argument. First, with respect to the way by which a defendant would have gotten to Danielson Ranch at ER Volume Two, pages 30 to 31, the testimony is that it would be two miles down the administrative road, as your honor suggested, Judge Fletcher. Second, near the end of his argument, my opponent said that the defendant told the officers it's not safe for me to leave. Respectfully, that is nowhere in the record. The only place in the record where a defendant ever suggests that it's not safe to leave is in his own opening statement, but if you actually look at his testimony of what he said... Well, he was pro se, and he's pro se in front of a magistrate judge, and I'm not inclined to be hyper technical about whether he needs to say it when he's hypothetically on the stand interviewing himself, or whether he says it in his opening statement. If he says it, he says it. I agree with that. However, it's not that he says in his opening statement, I told the officers it's not safe to leave. He says, sitting here today, it's not safe for me to leave. But when he gives the account of what he said to the officers, which is at ER Volume Two, page 51, he doesn't mention it at all. Instead, he describes a conversation in which he gives them a speech about his right to sleep where he wants on public land. He says, we told them that we were there because we were walking all day, and we stopped to rest for the night, and it was public land. And public space is all there is left now, really, to stop and rest. Everything else is private. It's highly populated. If you're going to move freely in this country, if you're going to be able to walk, do something besides sit in a car, you have to have access to public space. You have to sleep at night, and public space is where you can do that. And so we were claiming our right to do just that. This is public space. That's defendant's own of the conversation he had with them. And incidentally, look, defendant has clearly this creed of the... Now, does he have to tell them that, in his view, it's unsafe in order for it to be unsafe? No, not in order for it to be unsafe, but I think, yes, in order for him to claim the necessity defense. Well, why is that so? It's either necessary or not necessary, whether he tells the officers or not. No, respectfully no, Your Honor, because there are things the officers could do to eliminate the danger short of allowing defendant to violate the law. In this case, we know the officers had vehicles capable of transporting the mules because they did, in fact, transport the mules to an animal care center over the night. We know that they had vehicles capable of transporting the defendant because they did, in fact, transport him. So as this court has held, in order to claim the necessity defense, you have to seek permission from law enforcement for staying on federal land, and you must seek aid from law enforcement. And that's the Wofford case. Here, if he had simply said, look, officers, it's dark. I don't think I can make it to this Danielson camp. Is there any way you can get me there? I think the record here supports that they could. But again, I also want to be clear about what not the government's burden now to prove beyond any shred of a doubt that the only way the court could have found was a lack of necessity. It's defendant's burden to show that no rational fact finder could have rejected a necessity defense, and where the only evidence, if you considered evidence of necessity, is this one line in his opening statement. And then there is other things from which you could infer some degree of necessity, like it is dark out that it would have been a terrible danger to walk down this service road to Danielson Ranch. Let me ask you this. I do think I'm following up on a question from Judge LaMelle, and I guess it was implicit in Judge Gould's comment toward the beginning. There are two different charges here. One of them is camping, and the other one is refusing a lawful order. After the officers come up and the rangers come up and say, hey, you can't be here, he does appear to be violating an order, but he's no longer camping. Is that right? I don't know that that's right, Your Honor. What is camping then? Sure. The regulation defines camping as the temporary use of National Forest Service lands for the purpose of overnight occupancy without a permanent fixed structure. And that's... Kind of like domicile. So once you've started camping, you're still camping until you quit camping? It's an interesting question. I mean, we normally, you know, when I would camp, I would talk about breaking camp, Your Honor. You know, after you gather up your gear and you're ready to continue on, I would call that breaking camp. But this isn't like being found in the United States without having entered illegally, where there's a robust body of case law we can turn to. It's really just a matter of, you know... Well, where I'm heading with this question is, if we were to set aside the conviction for camping, but to leave intact the conviction for refusing a lawful order, what practical consequence, if any, would there be? Well, if you mean with respect to this case? Yes, with this case. It would expunge one of the two convictions. Yeah, no, I understand. That's the premise of my question. Yes, we get rid of one conviction, then what happens? And then I suppose, arguably, under unbundling rules, maybe it would go back for resentencing, although the sentence imposed is actually the mandatory minimum sentence for one count. So he would have to get the same sentence. The sentence was time served plus $10. $35. Well, $25 is an administrative fee, I gather. Yes. I just want one observation concerning the record following up on Judge Fletcher's question about was he camping. The record shows that he was in his sleeping bag already. Fires were out, I believe. And he was awakened, grumbly perhaps, coming out of the bag. And this is when this all followed occurred. My concern here is, and we've seen what I would consider to be perhaps more serious offenses, although they may be treated the same way under these parking rules and regulations, that sometimes the officers are given the discretion to make an arrest as opposed to giving a notice. Sometimes I see in cases of drug use on federal lands a notice. Sometimes I see arrests. This issue isn't necessarily before us right now. What would have occurred had a notice just been issued saying, okay, the fires are out. We don't see then the danger unless, I guess, in the morning he cooks his breakfast. I don't know. Could this all have been avoided? And I know it's a practical and I know it's not all before me, but that keeps ringing in my head for some reason. No, I think in this case the Park Service officers, rangers behaved absolutely appropriately. And the reason why is, as they testified to, this very area had suffered a wildfire not long in the past and they were concerned about that fire. And you're absolutely right, Judge LaMalle, that a warning would not necessarily have sufficed to ensure that the defendant wouldn't have started that fire again in the morning to make his coffee or his breakfast, what have you. Secondly, they were concerned, quite frankly, about the animals as well, one of which was untethered and wandering about. And the ranger said that he was concerned that there are rattlesnakes in the area, that there are coyotes in the areas that could have posed a danger to the animal. And, you know, the defendant sort of pooh-poohed that when he cross-examined the ranger. How much can I sort of interject my own practical knowledge of the danger that a rattlesnake poses at night to a mule, which is to say zero? Except that, you know, the premise, as I understood it of Judge LaMalle's question, was that if they allowed him to remain there over the night indefinitely, who is to say that that mule would have remained in the camp, that it would have wandered, such that, you know, it wouldn't. Conversely, if they tell him, okay, look, go down the way two miles along the administrative road to this ranch and leave it up to him, because I guess they weren't going to follow him. There's nothing in the record to infer that. And you're leaving it up to him to go to another site, a legal site permitted. What's the difference? Well, there are a number of differences. The legal campgrounds, and again, I mean, I'm not sure, we're now quite a bit outside the record, but typically designated campsites have been cleared abrush so that there's not a risk of fire. There's not the same risk of snakes. Coyotes tend to avoid areas like that. But if he would have said, okay, yes, I'll go on down the ranch. I think they would have followed him, respectfully. And the record is silent. And I mean, it's silent because this isn't a legal issue that the case presents, but they would have probably followed him precisely because if you look at the way these rangers acted here, they were acting not just as stewards of the land, but they were acting in the defendant's own interest. He himself says they were incredibly solicitous to him, incredibly nice. He has absolutely no complaints about the way they handled the situation. And so that's he himself. So why not just give them a notice? Because they, again, because they were concerned about the risk of fires, they were concerned about the danger to the animals. And I think this is a, if ever there was a place at which this court's well-established rule of deferring to law enforcement on judgments like this should apply, respectfully, it's with the park service. These are not cowboy cops who are, you know, trying to do something to put notches on their belt. These are stewards of the land who know this very area. Now, you may be right, Judge Fletcher, that rattlesnakes don't pose a risk to mules at night. But I have to say, if I had to pick between you, Your Honor, and one of the park service rangers as to who knows that area better, I'm going to pick the park service rangers. Well, I understand that that's a normal way to do it. But what happens if I so totally disbelieve the danger asserted about rattlesnakes being dangerous to mules at night that that causes me to question the rest of the testimony of the rangers? I understand what you're doing. But I want to tell you that everybody knows that rattlesnakes can be dangerous. But the danger posed by a rattlesnake to a mule at night is, I'll say it charitably, minimal. Yeah, this case in no way turns on the danger of a rattlesnake at night. This isn't a case where the government has to show necessity for moving the mules. I understand that it doesn't necessarily do it, but that's one of the justifications given by the rangers. And it's one of the justifications that you then reiterated. And I just want to express my substantial skepticism as to the degree of danger posed by a rattlesnake at night to a mule. And to be clear, I'm not sure that they were saying that their concern was that during the night, the mule would get bitten by a rattlesnake. As I understood it, their concern was that a mule being untethered in wilderness land posed that danger. And it's unclear if that's because they think the danger would occur, as I suspect, would make much more sense during the day if the mule had wandered off, the day got warmer or what. Again, though— Well, permit me to say I think the rattlesnake and coyote danger is a makeweight. The rangers, I don't think, needed it, but it looks to me like a makeweight. Okay. I would say the danger is to the rattlesnake from the mules. I mean, it's a joke, but I actually think you're right, Judge Romero, that a big part of the concern here is preserving these natural spaces. And defendants' basic view of this is there are these few last wilderness places where a person can commune with nature, and therefore I should be allowed to use them however I want. And respectfully, that is something that President Roosevelt recognized couldn't work. With parks, the national parks were open to use however anyone wanted. They would not be the pristine, beautiful places that defendant wants to walk in with his mule. So before your time runs, let me tell you what really bothers me about this case. According to the testimony of Mr. Sears, not challenged in this case, he went through an fence. There was nothing posted within sight of where he went through the fence to indicate that this was National Park. He then goes to sleep. He's wakened by the rangers. This is the first time he knew that this was National Park land. And then all the rest of this follows. If you guys had maintained your fence, this never would have happened. Well, I guess a few answers to that. I think that that is not necessarily clear to me. You mean, you think he would have broken down the fence? I think he would have just gone through the gate and still parked there anyway. But if he goes through the gate, there's a sign that tells him he's not supposed to be there. Yes, and this is a man who has said he doesn't think that he has, he is allowed to park in public land as a matter of right and that he won't camp in public campgrounds. But he didn't, but he didn't know when he started to camp that this was public land. I understand that. But I understood your question to be, if he had only seen a sign, would Mr. Sears have not camped here? And I think the answer is no. The record supports an inference that he would camp there because he has said in 31 years of going north and south through this state, he has never once camped legally in a designated campground. He has never camped in a private campground. He has never camped in a state park. But part of his testimony is, I don't camp in the state campgrounds because they don't let me do it. Didn't he testify to that? In the state designated campsites, because they won't let him do it. Not that he doesn't camp in state parks generally, but that he won't stay in their campsites because their campsite rules won't let him stay there with a mule. I read it differently, but perhaps you're right. But I read it to say, I don't go into the state parks because they won't let me do it. That's not how I read the record. And I don't think that it is incumbent on the Park Service, or even advisable for the Park Service, to build a wall around the national parks. It wouldn't be good. How about to maintain their fence? No, respectfully, I don't think that's a legal necessity, as is held in this case's prior decisions in this very area in Wilson and Kent. Both cases say that because of the difficulty of setting up means of showing people when they are entering Park Service land, there shouldn't be a mens rea requirement. That is based on a presumption that there wouldn't be fences with signs all around it. And that makes perfect sense, because if you, in this particular patch of the Santa Monica Mountains, there may be a fence. But generally speaking, it's not like Yellowstone is surrounded by a giant wall with signs on it saying, this is a national park. Nor should it be, because that would disrupt the natural habitats of the creatures that live there. But don't draw a distinction between Park Service land and wilderness land that is private property or is used for some other purpose. Okay. Thank you, Your Honors. No further questions from the bench? Okay, thank you. Response. Thank you. In terms of the necessity, he doesn't have to tell the officers that I have a necessity to do it. It's his subjective and objective state of mind. Well, but the question is, it has to be objective, not just subjective. And I thought the response, actually, is a fairly good one, which is to say, had he told the officers, listen, I'm really worried about this one. They might very well have said, well, listen, we understand that there may be some danger. We'll take care of that for you. He apparently didn't say that. And then, of course, they didn't respond either. Right. They never offered to take him to this ranch. And the equipment to take the mules away didn't come until after he was arrested. Right. No, I understand that. But the argument is that had he expressed to the rangers, I think this is dangerous, they might have responded in a way to eliminate or at least greatly reduce the danger. Yeah, we could speculate that they might have done that. Counsel, Judge Gould with a question for you, please. Don't we have circuit precedent that says that there's no mens rea required for this type of violation? There's cases about certain things of chopping down timber, selling hand grenades. But then there's cases with even machine guns where it says there has to be a mens rea requirement. And so this case is just mere sleeping. I don't think it's a public welfare offense where there can just be strict liability. I think there has to be some knowledge that what he's doing is against the law and he needs some kind of notice that he's doing that. So if we find this to be a public welfare, a regulation, a law, wouldn't that go against your argument for the need for mens rea? If this wasn't a public? If this was. If we take it that this was a public welfare. One thing is not public welfare. I understand, but if we say it is. Oh, well, if it is, then there is an exception to mens rea sometimes for certain public welfare offenses. I think Judge Gould was referring perhaps to the Kent case, I believe, out of this circuit. There was a national forest regulation at issue there where a mens rea requirement was not found necessary, I believe. Right. And I believe that case was about chopping down timber and that when you're chopping down timber, that's something you could think would be regulated, highly regulated, whereas were you just trespassing or sleeping somewhere, you wouldn't think that would be a highly regulated. Well, I don't agree with your premise on that, if I can just interject. When we're dealing with wilderness and public lands, why can't the park rangers feel that the aggregate effect of letting people sleep there is going to harm the natural environment? Well, because even if a million people sleep, there's no harm by just sleeping there. It's a natural environment. It's natural to sleep. Mules. But when they sleep there, they can't sleep there without walking into and across the grounds they're sleeping in. Right. Yeah. Well, this park, you're allowed to even walk there. I think even at night, they're allowed to walk there. It's just they weren't allowed to camp there. Judge Gould's question, though, refreshes my memory on Kent again. Kent, because it dealt with, as you stated, this logging issue, which was to me somewhat a part of economic concern as well, that mens rea might have been a requirement there. Here, the issue deals with public safety in the sense of wire fires. You heard your opponent talk about recent wire fires, and I don't think you can test that to that extent. That's a legitimate concern, isn't it? Right. And if he was charged with lighting an illegal fire, that would be a different case. That's not what he was charged with. No one's saying he's trying to commit arson, but accidents happen when you have fires in dry brush areas, and I assume this is one of those, I guess, from the record. But going to something else concerning the mens rea issue, the broken fence, as mentioned by Judge Schwartz's questioning, the idea that you had, as well, I think a sign posted concerning the prohibited camping in that area, about 300 feet away from where he entered the grounds where he eventually camped. If you take those in combination with the facts here, and then being told that the officers said that this is a prohibited area, taking all of the totality of the circumstances here, I'm finding it hard to believe that the law would require here mens rea. Now, personally, maybe I would go the other way and say it should, but it seems to me the precedent is not in your favor at that point. Well, he's... I believe there's... How can we get there? Well, there's the Kent case, but there's just, in general, dispensing with mens rea is disfavored. Now, if this was a fire case, you could see that perhaps lighting a fire in wilderness could be a strict liability offense, but that's not what he was charged with. He was charged with sleeping, and there's no way you would think that sleeping... But does it have to be the actual fire, as opposed to the great risk posed? Yeah, I mean, that's not what he was charged with, so there's no great risk to just sleeping. Well, I want to... I have to say it this way. If you're prohibiting camping, you are eliminating the risk that a camper will have a fire to cook a meal. So, by prohibiting camping, you are prohibiting open fires in non-designated areas, which then protects against wildfires, and that may be a more effective way of protecting against wildfire than prohibiting fires, because it's very easy to detect someone who's camping, but harder to detect someone who has a fire, because they'll light the fire for a cooking and then the fire will be gone. So, I think even though this is a prohibition against camping and a charge of forbidden camping, I think the same rationale with respect to fire still exists. But then they could say, well, if you want to prevent fires, just keep people out of parks altogether, and that would be another way to do it, and so it's just... I got it. All right, I have no further questions. Okay, thank you. Thank both sides for their argument. I understand that you took this case pro bono. Yes, Your Honor. Well, thank you very much for doing this on behalf, not only of your client, but on behalf of the court, and given the nature of the case, you've done a fine job. I will compliment the U.S. Attorney for doing a fine job, but you got paid. Okay. Thank both of you. United States v. Sears is now submitted for decision. Thank you.
judges: W. Fletcher, Gould, Lemelle